UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TYRIKIA PORTER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-5883** |
| **HOUMA TERREBONNE HOUSING AUTHORITY BOARD OF COMMISSIONERS** | **DIVISION "3"** |

**ORDER**

On July 23, 2014, Defendant's Motion for Summary Judgment [Doc. #16] came on for oral hearing before the undersigned.  Present were Ravi Sangisetty and Michael Lillis on behalf of plaintiff and Joshua Christie and Edward Trapolin on behalf of defendant.  After the oral hearing, the parties filed supplemental memoranda.  Having reviewed the motion, the opposition, the supplemental memoranda and the case law, the Court rules as follows.

**I.      Background**

Defendant Houma Terrebonne Housing Authority Board of Commissioners ("HTHA") employed plaintiff Tyrikia Porter from 2001 until she resigned her position in 2005 to work for Nicholls State Chemistry Department. [Doc. #16-4 at pp. 9-10]. The HTHA asked Porter to return and ultimately rehired her approximately seven months later in July 2005 as a Public Housing Manager. [*Id.*].  After returning to work in 2005 and during the course of her employment thereafter, Porter threatened numerous times to quit her job with the HTHA. [Doc. #16-5 at p. 25].

The HTHA maintains a sexual harassment policy that explains what actions constitute sexual harassment and details the procedures for reporting alleged violations thereof. [Doc. #16-6 & 16-7]. Porter acknowledges that she received a copy of the employee handbook, including the sexual harassment policy, when the HTHA rehired her in 2005, and she further stated that she is familiar with the procedures spelled out in therein. [Doc. #16-4 at pp. 116, 136].

Wayne Thibodeaux began working for the HTHA as Executive Director in April 2006. [Doc. #16-8 at pp. 12-13]. Porter alleges that Thibodeaux sexually harassed her from 2006 until she resigned from the HTHA in 2012. [Doc. #1 at ¶ 8]. Porter alleges that beginning in 2006, Thibodeaux made frequent comments about her appearance in front of co-workers that embarrassed her and made her feel uncomfortable. [*Id.* at ¶ 9]. Porter testified that Thibodeaux would comment that she "was wearing his favorite colors," "must have been thinking about him as [she] got dressed," or that she "brighten[ed] up the room." [Doc. #16-4 at pp. 18-21]. Porter admitted that Thibodeaux never made overtly sexual comments about specific parts of her body. [*Id.* at p. 37]. Porter testified that Thibodeux's behavior did not become "more extreme over time," but rather his comments about her attire simply became more common. [*Id.* at p. 39]. Porter was still was able to perform her job despite her alleged humiliation from such comments. [*Id.* at p. 40]. Porter's supervisor Jan Yakupzack observed certain of Thibodeaux's comments about Porter's clothing, but she testified that she "observed a friendly relationship with them, a comfortable relationship." [Doc. #16-5 at pp. 17-20]. Porter testified that Thibodeaux's comments caused her co-workers to gossip about her behind her back. [Doc. #16-4 at pp. 43-44]. There is, however, no testimony in the record from another employee to substantiate this allegation.

Thibodeaux also commented on Porter's weight. Specifically, he would tell Porter which

foods she should eat, and, if he thought she was eating a questionable food, he would say, "Why are you eating this? It's going to make you gain weight." [*Id.* at p. 35].  Thibodeaux would also compare Porter to his wife and say, "You're going to start to be like her, gaining weight." [*Id.*]. Additionally, Thibodeaux would often stare at Porter and look at her from head to toe as if he were undressing her with his eyes. [*Id.* at pp. 139-40].  Thibodeaux also insulted Porter by referring to her menstrual cycle in an e-mail correspondence, specifically stating, "??? Is it that time of the month." [Doc. #21-10].

Porter also alleges that in 2007, Thibodeaux harassed her via e-mail by pressuring her to travel on overnight work trips with him after she refused to go to lunch. [Doc. #1 at ¶ 8].  Porter testified that in her response e-mails, she stated that she did not think it was appropriate for a single female to travel with her boss. [Doc. #16-4 at pp. 15-16].  She further testified that Thibodeaux responded that he didn't think that Porter's refusal to go to lunch or travel with him was a workable situation as he couldn't operate his program around what other people would think about such interactions. [*Id.*].  There were no sexual undertones in the e-mails, and Thibodeaux took no action against Porter. [*Id.* at pp. 16-17].  Rather, Thibodeaux did not ask Porter to lunch again, [*id.* at p. 98], and Porter ultimately attended overnight training events that were also attended by Thibodeaux without any alleged instances of harassment. [*Id.* at pp. 23-26].

Porter also alleges that Thibodeaux left her inappropriate voicemails. [Doc. #1 at ¶ 11]. On October 4, 2010 and February 23, 2011, Thibodaux did in fact leave work-related voicemails wherein he indicated that she had a "sexy voice." [Doc. #16-5 at pp. 34-35].  Porter received no other voicemails from Mr. Thibodeaux during their approximately six years working together that she deemed inappropriate. [Doc. #16-4 at p. 121].

At some point after receiving Thibodeaux's voicemails, Porter played one of the voicemails to Yakupzack and discussed it with her. [*Id.* at p. 117]. This was the one and only time that she discussed alleged sexual harassment with her supervisor. [*Id.*]. When no action was taken, Porter "didn't report anything to her about anything." [*Id.*]. The HTHA policy instructs that employees who do not receive satisfactory responses from their supervisors should then report the violation directly to the Executive Director. [Doc. #16-6].

The last specific instance of harassment is a 2011 incident that occurred in Thibodeaux's office. [Doc. #1 at ¶ 13]. Porter alleges that, during a work-related meeting, Thibodeaux began commenting on her personal life, and that she became uncomfortable. [Doc. #16-4 at pp. 28-32]. The comments concerned an earlier miscarriage by Porter and Thibodeaux's belief that she lost the child due to her pre-marital "fornication." [*Id.*]. She further alleges that when she attempted to leave, Thibodeaux blocked the door until several requests that he move aside, which he eventually did. [*Id.*]. Porter claims that Thibodeaux brushed against her as she walked out, and she further stated that this was the only instance of physical contact with Thibodeaux. [*Id.* at p. 27]. Porter admitted that during this incident, Thibodeaux made no comments that were sexual in nature, and she did not feel that he was making a "pass" at her. [*Id.* at pp. 31-32].

On June 6, 2012, Porter resigned her position with the HTHA, effective August 1, 2012. [Doc. #16-9]. In her resignation letter, she gave no reasons for her decision to resign. [*Id.*].

On or about July 12, 2012, Porter's fiancé, Dwan Troy Johnson (also an HTHA employee), filed a grievance against Thibodeaux. [Dic. #16-10]. Although the primary concern of Johnson's grievance was an incident involving a tenant, the grievance also included allegations of sexual harassment against Porter. [*Id.*]. At some point between Johnson's filing of his grievance and the

4

date it was heard by the HTHA Board of Commissioners (July 26, 2012), Board Chairman Allen Luke met with Porter. [Doc. #16-11 at pp. 61-62]. When Luke asked Porter if she wished to file a complaint, she responded that she would wait until after Johnson's grievance hearing. [*Id.*].

On July 25, 2012, Porter requested that her date of separation be extended until September 1, 2012 so that she could be of further assistance to the HTHA. [Doc. #16-12]. HTHA granted her request to extend. [Doc. #16-13].

HTHA held a hearing on Johnson's grievance on July 26, 2012 at which Porter testified, among other things, about her allegations of sexual harassment. [Doc. #16-4 at pp. 45-51]. After the hearing, Porter did not avail herself of the sexual harassment policy or file a complaint against Thibodeaux. [Doc. #16-11 at p. 95].

On August 2, 2012, HTHA held a Special Board Meeting to discuss, among other items, Johnson's grievance. [Doc. #16-14]. The meeting minutes indicate that professional training was recommended for Thibodeaux and his employees on sexual harassment and any other topic deemed necessary. [*Id.* at p. 3].

On August 17, 2012, Luke wrote a letter to Thibodeaux to memorialize the Board's decision and action as it pertained to Johnson's grievance. [Doc. #16-15]. According to the letter, the Board made specific findings on each of the issues raised by Johnson and, relevant to Porter, directed "all employees" of the HTHA to attend a professionally-conducted class "dealing with employee/employer relations, including sexual harassment." [*Id.*]. The letter also indicates that the HTHA looked unfavorably on Thibodeaux's actions and that he was directed to refrain from similar activity, conduct, or comments in the future, or consequences would occur. [*Id.*].

On September 4, 2012, Porter asked that she be allowed to rescind her resignation. [Doc.

5

#16-16]. On that same day, she also requested 52 hours of personal leave time. [Doc. #16-17]. Porter indicated to Yakupzack that she wished to continue to work for the HTHA until she could find another job. [Doc. #16-5 at p. 40].

Ultimately, in a letter dated September 10, 2012, Thibodeaux advised Porter that her request to rescind her resignation would not be granted, and her effective date of separation from the HTHA would be September 12, 2012. [Doc. #16-15]. Thibodeaux testified that "after threats, and then after two letters that 'I'm going to separate, and I change my mind,'" he determined that Porter was not satisfied or happy as an employee. [Doc. #16-8 at pp. 47-48]. This was his sole reason for not accepting Porter's resignation. [*Id.*].

Porter filed a Charge of Discrimination with the Equal Employment Opposrtuniy Commission ("EEOC") dated March 25, 2013, in which she alleged that she was sexually harassed by Thibodeaux from June 28, 2012 until September 11, 2012. [Doc. #16-19]. She further alleged that she filed a grievance with the HTHA on July 25, 2012. [*Id.*]. However, Porter testified that she never availed herself of the protections of the HTHA policy. [Doc. #16-4 at pp. 107-08].

On July 29, 2013, the Department of Justice issued a Notice of Right to Sue Letter regarding Porter's EEOC claim, noting that the letter did not indicate that the Department of Justice had made a judgment as to whether her claim was meritorious.

On September 9, 2013, Porter sued the HTHA in this Court asserting causes of action for sexual harassment/hostile work environment and retaliatory discharge under Title VII of the Civil Rights Act of 1954, 42 U.S.C. §2000e *et seq.*, and Louisiana Employment Discrimination Law.

**II.    Law and Analysis**

    **A.    Summary Judgment Standard**

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in [his] favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325;  *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

### B.     Law and Analysis

#### 1.     Sexual Harassment/Hostile Work Environment

HTHA first argues that Porter has failed to establish an actionable claim of sexual harassment/hostile work environment.  A hostile work environment claim consists of five elements: (1) the employee was a member of a protected group; (2) the employee was subjected to unlawful harassment; (3) the harassment complained of was based on a protected characteristic, *e.g.*, sex; (4)

the harassment complained of affected a "term, condition, or privilege" of employment; and (5) the employer knew or should of have known of the harassment and failed to take prompt remedial action. *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 298 (5th Cir. 2001).

HTHA maintains that Porter can not meet the fourth element of her claim.[1] For harassment to affect a term, condition or privilege of employment, it must be both objectively and subjectively abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). The Supreme Court has long held that Title VII is not meant to be a "general civility code" for all workplace incidents that involve boorish behavior. *Faragher v. City of Baton Rouge*, 524 U.S. 775, 788 (1998). The Fifth Circuit has held that, to survive summary judgment, the alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents. *Shepard v. Comptroller of Pub. Accounts*, 168 F.3d 871, 873 (5th Cir. 1999). To determine whether conduct is objectively abusive, courts look to the totality of the circumstance, the frequency of the discriminatory conduct, its severity, whether it involves physical threats or humiliation as opposed to mere offensive utterances, whether it unreasonably interferes with an employee's work performance, and whether the complained-of conduct undermined the plaintiff's workplace competence. *See id* at 787-88; *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 325-26 (5th Cir. 2004).

A *prima facie* case of hostile work environment under Title VII requires a plaintiff to show

---

[1] HTHA first argues that Porter fails to satisfy the third element of a hostile work environment claim. Because the Court resolves this motion as to the fourth and fifth elements, it does not address this argument.

that "more than just a few isolated incidents of [sexual] enmity" occurred. *Roberts v. Tex. Dep't of Human Servs.*, 275 F.3d 1083, 2001 WL 1468757, at *2 (5th Cir. Oct. 31, 2001). Occasional comments do not rise to the level of severe or pervasive harassment. *See id.* "It is only a violation of Title VII when the workplace is so 'heavily polluted with discrimination as to destroy the emotional and psychological stability of the minority [employee].'" *Id.* (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)). To succeed on a claim of constructive discharge discrimination, "an employee 'must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign.'" *Stover v. Hattiesburg Pub. School Dist.*, 549 F.3d 985, 991 (5th Cir. 2008) (citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)). "This objective test has been referred to as the reasonable employee test." *Id.*

HTHA maintains that Porter can not establish that the alleged conduct was either severe or pervasive. HTHA notes that Porter alleged no physical contact and contends that the allegedly harassing comments were not nearly as severe as those in other cases. And, it maintains, the conduct was not pervasive. HTHA notes that the only allegation of recurring conduct is that Thibodeaux repeatedly complimented her clothing. Porter admits that the comments never became more severe over time, and she was always able to perform her job.

Citing case law, HTHA argues that courts have routinely held that behavior that is much more egregious than that alleged here has failed to rise to the level of a hostile work environment. *See, e.g., Gibson v. Potter*, 264 Fed. Appx. 397, 398 (5th Cir. 2008) (holding that conduct of supervisor who "grabbed [plaintiff] on the buttocks and made suggestive comments" while she was conversing with another employee was not "sufficiently severe or pervasive to alter a term or condition of [plaintiff's] employment"); *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 328

(5th Cir. 2004) (holding that sexually suggestive comments, slapping plaintiff on the behind with a newspaper, grabbing or brushing up against plaintiff's breasts and behind, and attempting to kiss plaintiff did not qualify as severe); *Derouen v. Carquest Auto Parts, Inc.*, No. 01-30369, 2001 WL 1223628, at *1 (5th Cir. Sept. 24, 2001) (holding that plaintiff's allegations that co-worker attempted to grab her breast and later touched and rubbed her thigh, that customers made sexually threatening remarks, and that supervisors did not respond to her complaints about these incidents, did not support a hostile work environment claim).

Porter maintains that she has established that the alleged conduct was severe and pervasive. She maintains that Thibodeaux's harassment was incessant and unyielding. She notes that she testified that Thibodeaux made comments on a daily basis. At a minimum, she contends, she has established that a genuine issue of material fact for the factfinder exists. She also argues that she has established that Thibodeaux's conduct was both objectively and subjectively offensive. She contends here that the critical inquiry is whether she has established a genuine issue of material fact as to whether Thibodeaux's advances were welcome.

Courts have dismissed Title VII claims when conduct far more egregious occurred that that alleged here. *See, e.g., Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858 (8th Cir. 2009) (affirming summary judgment and finding that supervisor's rubbing of plaintiff's shoulders or back at times, calling her "baby doll" and "honey," accusing her of not wanting to be "one of his girls," telling plaintiff she should be in bed with him and insinuating she would go farther in the company if they got along were not sufficiently severe or pervasive to create an abusive working environment); *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000) (finding that coworker's touching of plaintiff's stomach and then her breast under her sweater was very offensive but did not

10

rise to level of harassment for which Title VII offers a remedy); *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261-63 (10th Cir. 1998) (affirming summary judgment on plaintiff's sexual harassment claim when she complained of unwanted physical contact, including her supervisor touching her shoulder, brushing against her as he passed her and periodically touching her arms or hands in a "slow and meaningful" manner); *Stacy v. Shoney's, Inc.*, 142 F.3d 436 (6th Cir. 1998) (affirming summary judgment on grounds that the conduct of plaintiff's manager making sexually-suggestive comments and leering looks, calling plaintiff at home to tell her he missed her, inappropriately touching her breast, and telling her that her tan looked good and he wished he "could see more of it," that he "liked it better when [she] wore [her] hair down," that if he had someone like her, he would not let her leave the house and that he'd move in with her and take care of her were not sufficiently severe or pervasive); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357, 361-62 (7th Cir. 1998) (affirming summary judgment and holding conduct insufficient to support hostile environment claim when employee teased plaintiff, made sexual jokes aimed at her, told her not to wave at police officers "because people would think she was a prostitute," commented about low-necked tops, leered at her breasts, and touched her arm, fingers, or buttocks on four occasions); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (affirming summary judgment after concluding no sexual harassment when plaintiff's supervisor asked plaintiff for dates, asked about her personal life, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs at her work station, and attempted to kiss her twice at work and once in a bar); *Saxton v. AT&T*, 10 F.3d 526 (7th Cir. 1993) (rejecting sexual harassment claim when plaintiffs' supervisor: (1) placed his hand on her knee several times; (2) rubbed his hand along her upper thigh; (3) pulled her and kissed her for two to three seconds until she pushed him away; and (4) "lurched"

at her from behind bushes as if to grab her; and (5) teased her about her romantic interest in coworker); *Landers v. CHLN, Inc.*, Civ. A. No. 07-75, 2009 WL 803777 (E.D. Ky. Mar. 25, 2009) (concluding that multiple comments about plaintiff's breasts, requests to lick whip cream and wine off of her, inappropriate touching while hugging plaintiff, requests to go out, rubbing plaintiff's shoulders, arms and rear end and inappropriate text messages were not sufficiently severe or pervasive). Indeed, this very Court has recently granted summary judgment to a defendant in a lawsuit in which more egregious conduct occurred. *See Matherne v. Ruba Management*, Civ. A. No. 12-2461, 2014 WL 2938100 (E.D. La. June 27, 2014), *appeal docketed*, No. 14-30864 (5th Cir. July 23, 2014). The case law to which HTHA cites – and the case law found by this Court – demonstrates that much more egregious behavior has failed to establish a hostile work environment. While some of Thibodeaux's comments and behavior were boorish and puerile, the Court finds that under the case law, it is neither severe not pervasive enough to establish a cognizable hostile environment claim.

Even were Porter able to establish the fourth element of her claim, HTHA argues that she can not establish the fifth, and that the *Ellerth/Faragher* defense applies here. An employer can satisfy the first prong of the *Ellerth/Faragher* defense by implementing suitable institutional policies and educational programs regarding sexual harassment. *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 462-63 (5th Cir. 2013) (citing *Lauderdale v. Tex Dep't of Criminal Justice*, 512 F.3d 157, 164 (5th Cir. 2007); *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 413 (5th Cir. 2002)). Not every policy eliminates liability; generic policies that offer no specific complaint procedure may be insufficient to satisfy the *Ellerth/Faragher* requirements. *Id.* at 462-63 (citations omitted). HTHA maintains that here, the evidence is clear that at all relevant times the HTHA maintained a sexual

harassment policy that explains what actions constitute sexual harassment and details the procedures for reporting alleged violations thereof. This is undisputed. Thus, the first prong of the defense is satisfied.

Porter maintains that the *Ellerth/Faragher* defense does not shield HTHA for two reasons. First, she reported the alleged conduct to Ykupzack when she played the voicemails for her. Second, she notes that Johnson complained to the HTHA Board about the sexual harassment. She maintains that HTHA's sexual-harassment policy allows a third-party to report it, and that no formal writing is required. These arguments are unavailing.

Porter admitted knowing the policy existed, and she unreasonably failed to take advantage of the preventive or corrective opportunities provided by the HTHA therein. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). She admitted that she is familiar with the procedures spelled out in the employee handbook and acknowledged that she received a copy of the Sexual Harassment Policy when she returned to work for the HTHA in 2005. Despite this awareness, she only had one conversation with her supervisor and never complained to a higher level when her supervisor failed to satisfactorily respond to the initial report. In fact, Porter never actually availed herself of the policy or filed a grievance against Thibodeaux. Instead, her allegations of sexual harassment were not brought to the HTHA's attention until July 2012 – after she had already resigned her position with the HTHA – as an ancillary issue to a grievance filed by Johnson. Still, the Board took action, and called for sexual harassment training for all employees, including Thibodeaux. The second prong of the defense is thus satisfied as well. Accordingly, Porter's claim for a hostile work environment fails.

**2.    Retaliation**

To establish a *prima facie* case for retaliation, three elements are required: (1) the employee engaged in an activity that Title VII protects; (2) the employee was subjected to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Giddens v. Cmty. Educ. Ctrs, Inc.*, 540 F. Appx. 381, 389-90 (5th Cir. 2013) (citing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007). "The proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred 'but for' her protected conduct." *Id.* (quoting *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005).

HTHA contends that Porter is unable to satisfy two of these three requirements. With regard to the second requirement, HTHA maintains that the evidence reveals that Porter resigned, for a second time, from her employment with the HTHA before she ever engaged in protected activity by making allegations of sexual harassment to the HTHA Board. Porter first resigned in 2005. After being re-hired, she later resigned again on June 6, 2012. On July 25, 2012, she requested that her resignation be extended so she could continue to work until September 1, 2012. Porter did not report her allegations of sexual harassment to the Board until July 26, 2012, after she had already resigned both the first and second times. That her separation from the HTHA was a resignation and not a termination was confirmed by an Administrative Law Judge in denying her request for unemployment benefits. Because Porter resigned, she undoubtedly could not have suffered an adverse employment action as a result of her reporting the alleged sexual harassment. Consequently, HTHA argues, she is unable to meet the second prong of a retaliation claim, and the claim must fail as a matter of law.

For similar reasons, HTHA maintains that Porter can not establish a causal connection

between her report of alleged sexual harassment and the HTHA's decision not to accept her attempt to rescind her second resignation from HTHA's employment. HTHA alleges that no adverse employment action could have been taken since she had already resigned before engaging in protected activity. Furthermore, the sole reason that Porter's request to rescind her resignation was not granted was that her repeated threats to resign led Thibodeaux to conclude that she was not satisfied or happy as an employee. Porter offers no evidence to controvert that statement, and consequently can not show that but for her report of sexual harassment, she would have been allowed to remain an employee despite her resignation. *Giddens*, 540 Fed. Appx. at 389-90.

Porter maintains that she suffered an adverse employment action when HTHA terminated her from her position less than a month after she reported the sexual harassment to her supervisor. She notes that the Fifth Circuit holds that close timing between the protected activity and the adverse action can establish the causal connection necessary under Title VII. She notes that she was fired seven weeks after she testified at the grievance hearing. She notes that she was a full-time HTHA employee at the time of her testimony as her resignation had been rescinded. She maintains that HTHA's articulation of its legitimate non-discriminatory reason for terminating her was pretextual. She argues that all HTHA relies on is the unsupported decision by Thibodeaux that he determined that Porter was unhappy and unsatisfied as an employee. She also points to the fact that she attempted to rescind her resignation before she was terminated.

But courts "have held that the refusal to allow rescission of a voluntary resignation does not constitute an adverse action." *Cadet v. Deutsche Bank Sec. Inc.*, 11 CIV. 7964, 2013 WL 3090690 at *13 (S.D.N.Y. June 18, 2013) (internal quotations omitted) (gathering cases). "The reason for this is simple: employers are not usually obligated to allow their employees to rescind their

15

resignations." *Id.* (citing *Smith v. DeTar Hosp. L.L.C.*, No. 10 Civ. 83, 2012 WL 2871673, at *13 (S.D. Tex. July 11, 2012); *cf. Wilkerson v. Springfield Pub. Sch. Dist. No. 186*, 40 F. Appx. 260, 263 (7th Cir. 2002); *Schofield v. Metro. Life Ins. Co.*, No. 03 Civ. 0357, 2006 WL 2660704, at *9 (M.D. Pa. Sept. 15, 2006), *aff'd*, 252 F. Appx. 500 (3d Cir. 2007). "[A]bsent a contractual or statutory duty to permit rescission, the employer would essentially be put into a box: either permit the rescission so as to avoid a later claim that the refusal was retaliatory or face the risk of a lawsuit." *Jones v. McCormick & Schmick's Seafood Restaurants, Inc.*, 1:12-CV-04503, 2014 WL 1669808 at *5 (D.N.J. Apr. 28, 2014). The Court will not put HTHA in such an untenable position.

Porter attempts to distinguish this case law by arguing that she was still a full-time employee of HTHA at the time that she testified at the grievance hearing because HTHA had extended her rescission date. But this is a distinction without a difference. The simple fact of the matter is that Porter had – at the time that her request for an extension was denied – resigned from HTHA on three occasions. While Porter may have been an employee at the time that she requested an extension and when she testified at the hearing, she had a resignation date, and HTHA had no duty to know that she would once again attempt to rescind it. This factual distinction – if indeed it even is one – does not call for a modification of the case law.

### III. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [Doc. #56] is GRANTED.

New Orleans, Louisiana, this 19th day of August, 2014.

_____
**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**